**In re PACIFIC GAS AND ELECTRIC CO., Appellant, Cross–Appellee, Debtor and Debtor in Possession.**

**No. C–02–1550 VRW.**
**Bankruptcy No. 01–30923 DM.**

United States District Court,
N.D. California.

Aug. 30, 2002.

## ORDER

WALKER, District Judge.

PG & E appeals from a March 18, 2002, order of the bankruptcy court, entitled "Order and Judgment Disapproving Disclosure Statement; Rule 54(b) Certification" (bankruptcy order), which embodies a ruling issued on February 7, 2002, entitled "Memorandum Decision Regarding Preemption and Sovereign Immunity" (bankruptcy decision). Doc. # 1. On June 24, 2002, the court denied a motion to dismiss PG & E's appeal filed by The People of the State of California, the California Public Utilities Commission (CPUC) and the City and County of San Francisco (collectively, objectors). Doc. # 68. The court determined that the bankruptcy court's F.R.C.P. 54(b) certification was proper and, consequently, that appellate jurisdiction exists as of right, pursuant to 28 U.S.C. § 158(a)(1). In the alternative, the court granted PG & E's "protective" motion for leave to file an interlocutory appeal, pursuant to section 158(a)(3), determining that in the event the bankruptcy court's F.R.C.P. 54(b) certification was not proper, the court would still exercise its discretion to hear this appeal.

This appeal poses a discrete question of statutory interpretation of tremendous importance to one of the largest bankruptcies in United States history.

## I

This matter, like many others currently in federal court and in this district, including an action filed by PG & E against the CPUC, is tied to California's attempt to restructure its regulatory scheme for the generation and sale of electricity. In *PG & E v. Lynch*, 216 F.Supp.2d 1016, 2002 U.S. Dist LEXIS 13895 (N.D.Cal.2002), the undersigned discussed at length California's statutory scheme implementing this restructuring, the energy crisis beginning in the summer of 2000 and the resulting effects on PG & E. The court will not repeat this discussion here, although it provides the backdrop for PG & E's bankruptcy and the instant appeal.

On April 6, 2001, claiming that the combination of the energy crisis and the retail rate freeze enacted as part of California's restructuring scheme had ruined its credit rating and led to "billions of dollars in defaulted debt and unpaid bills," PG & E Br. (Doc. # 14) at 5, PG & E filed a voluntary petition under chapter 11 of title 11 of the United States Code (bankruptcy code) in the United States Bankruptcy Court for the Northern District of California. On December 19, 2001, PG & E and its parent company filed their first amended plan (December plan) of reorganization and their first amended disclosure statement. See E.R. at 153, 207.

Central to the December plan is the disaggregation of PG & E, which involves the creation of three new limited liability companies and the separation of PG & E's operations into four lines of business, reflecting PG & E's historical functions: retail gas and electric distribution; electric transmission; interstate gas transmission and electric generation. As a result of the reorganization contemplated by the plan, four companies, all subsidiaries of PG & E's parent company, would emerge from bankruptcy: ETrans, containing PG & E's electric transmission assets; GTrans, PG & E's gas transmission assets; Electric Generation (Gen), PG & E's generation assets; and the Reorganized PG & E, which would continue in the retail sale and distribution of electricity and gas. According to PG & E, the entities involved in electric transmission, interstate gas transmission and electric generation will no longer be subject to the regulatory jurisdiction of the CPUC after reorganization, but will be under the exclusive ratemaking jurisdiction of the Federal Energy Regulatory Jurisdiction (FERC). The Reorganized PG & E would remain under the CPUC's regulatory jurisdiction, subject, however, to the limits imposed upon that jurisdiction by federal law. See *PG & E v. Lynch*, 216 F.Supp.2d 1016, 2002 U.S. Dist. LEXIS 13895.

Absent preemption, state law poses a formidable obstacle to the execution of several of the central transactions required to carry out the plan. For example, a critical feature of the plan is the transfer of PG & E's retained generation to the new limited liability company, Gen. According to the CPUC, however, such a transfer of generation assets would be illegal under California Public Utilities Code § 377, enacted in January 2001, which prohibits an owner of electric generation facilities from disposing of any such facilities until January 1, 2006. The CPUC also contends that several of the critical transactions proposed in the plan require state regulatory review and approval under state health, safety, welfare and environmental statutes, including the California Environmental Quality Act

(CEQA). Under California Public Utilities Code § 851, for example, PG & E would ordinarily be required to obtain state approval to sell, lease or spin off its utility facilities. According to the CPUC, an application for such approval requires an environmental review under CEQA.

As noted in this court's June 24 order, the CPUC objected to PG & E's disclosure statement in the proceedings below. The CPUC asserted that the proposed reorganization (1) impermissibly sought to preempt state and federal law not subject to preemption and (2) sought declaratory and injunctive relief against California in violation of principles of sovereign immunity. In response to the former objection (the latter is not at issue in this appeal), PG & E asserted that all state—and most if not all other non-bankruptcy—laws are expressly preempted by § 1123(a)(5) of the bankruptcy code insofar as they purport to prohibit, veto or nullify transactions necessary to implement the restructuring proposed in the plan. Pursuant to § 1123(a)(5), PG & E asserted that a confirmation order approving its plan and authorizing the transactions contemplated by the plan would:

> preempt "otherwise applicable nonbankruptcy law" in the following areas: (1) any approval or authorization of the CPUC or compliance with the California Public Utilities Code or CPUC rules, regulations or decisions otherwise required to transfer public utility property (including authorizations to construct facilities), issue securities and implement the Plan; and (2) the exercise of discretion by any other state or local agency or subdivision to deny the transfer or assignment of any of the Debtor's property, including existing permits or licenses, or the issuance of identical permits and licenses on the same terms and conditions as the Debtor's existing permits and licenses where both the Reor-

ganized Debtor and one or more of ETrans, GTrans and Gen requires such permit or license for their post Effective Date operations.

First Am. Disc. Statement (ER 346).

Notably, PG & E contends that the preemption authorized by § 1123(a) occurs "at the time the Plan is implemented." *Id.* In other words, PG & E does not contend that its reorganization plan has the effect of preempting application of nonbankruptcy law that would apply to the reorganized PG & E and the new entities after reorganization. Rather, PG & E explicitly concedes that the four companies emerging from bankruptcy will be subject to all applicable state and federal law on a going-forward basis. Moreover, PG & E states that it intends to follow "the established procedures for the transfer of most permits and licenses," as many of these procedures are "ministerial or governed by objective criteria that make it unlikely that the agency or subdivision could act or fail to act in a way that would interfere with consummation of the Plan." *Id.* PG & E seeks to be free only from nonbankruptcy requirements that threaten the reorganization provided for in the plan. To be sure, PG & E's concern that, absent some form of preemption, state actors such as the CPUC could exercise a veto over PG & E's proposed reorganization is not without basis. Throughout its brief filed in this matter, the CPUC makes clear its displeasure not just with PG & E's attempt to evade state regulatory processes, but with the goal PG & E is pursuing and, in particular, the transfer of regulatory control from the state to FERC over several of PG & E's lines of business. According to the CPUC this is not a desirable outcome, as "federal regulation is not an adequate substitute for state regulation on many practical levels." CPUC Br (Doc. # 78) at 13.

On February 7, 2002, the bankruptcy court issued its memorandum decision regarding preemption and sovereign immunity, rejecting PG & E's "across-the-board, take-no-prisoners" claim that § 1123(a)(5) allows it to "disaggregate with unfettered preemption of any contrary nonbankruptcy law." Bankr. Dec. (ER 863) at 46, 40. In a lengthy decision, the bankruptcy court rejected

> the notion that Congress, without a hint in the legislative history in a section of the Bankruptcy Code entitled "Contents of Plan," and using words calling for "adequate means for the Plan's implementation," intended to permit a debtor's plan—confirmed by a bankruptcy judge (not by legislative act, as in most preemption situations)—to obliterate a whole area of jurisdiction and authority traditionally left to state law.

*Id.* at 22–23.

Although rejecting PG & E's claim that nonbankruptcy laws otherwise applicable to the restructuring transactions proposed in the plan were expressly preempted by the bankruptcy code, the bankruptcy court did not, however, finally determine that state laws operating as impediments to PG & E's proposed reorganization could not be preempted under principles of implied preemption. Indeed, the bankruptcy court expressed its "belie[f] that the Plan could be confirmed if Proponents are able to establish with particularity the requisite elements of implied preemption;" and noted that "[i]f the Disclosure Statement is amended consistent with this Memorandum Decision, the court will approve it and let the Proponents test preemption at confirmation." *Id.* at 3. The bankruptcy court directed PG & E to identify, as part of its attempt to show implied preemption, the laws it wished to preempt and "to state in summary fashion" why the laws should be preempted. *Id.* at 40.

Recognizing the centrality of the issue it decided, the bankruptcy court certified its decision for immediate appeal, pursuant to F.R.C.P. 54(b), made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 7054(a) and Fed. R. Bankr. P. 9014:

> This is a Chapter 11 case of enormous significance to thousands of creditors owed billions of dollars. It is clearly one of the largest bankruptcies in United States history, and definitely the largest involving a public utility. An attempt by a utility to free itself from state regulation to the extent contemplated by the Plan is virtually without precedent. Further, PG & E expects to pay creditors in full with interest, but already this case is nearly a year old and further delay should be avoided. Creditors have a real economic interest in a speedy resolution of this case. If a court on appeal believes that express preemption is available here, the rule of law should be settled forthwith.

Bankr. Order (ER 924) at 5–6.

■ As noted, this court determined that certification was proper. The bankruptcy court's judgment is, therefore, properly before the court, pursuant to 28 U.S.C. § 158(a)(1). This appeal poses essentially a single question of statutory interpretation. The bankruptcy court's interpretation of the bankruptcy code is reviewed de novo. See, e.g., *Tighe v. Celebrity Home Entm't, Inc.*, 210 F.3d 995, 997 (9th Cir.2000).

## II

### A

■ In relevant part, § 1123(a) provides:

(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—

\*　　\*　　\*　　\*　　\*　　\*

(5) provide adequate means for the plan's implementation, such as—

\* \* \* \* \* \*

(B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan;

The court first notes that, although it may sometimes seem so from the parties' briefs and the oral arguments at the hearing on this appeal, this is not a matter of deciding whether § 1123(a) expressly preempts some nonbankruptcy law or impliedly preempts some bankruptcy law. There is, in fact, no question that § 1123 expressly preempts some nonbankruptcy law—both parties agree that the "notwithstanding" phrase has some express preemptive meaning—the dispute is over which laws are preempted and in what context. With respect to this dispute, the parties' interpretation of the statutory section differ widely.

The CPUC contends, and the bankruptcy court essentially agreed, that § 1123 is merely a "directive" statute, specifying in subsection (a) thereof what *must* be put in a reorganization plan and in subsection (b) what *may* be put in a reorganization plan. The purpose of the section is to require "that adequate information be provided that would enable a hypothetical investor typical of holders or claims or interests of a relevant class to make an informed judgment about the plan." Bankr. Dec. at 22. Under this interpretation, the central phrase in dispute, "[n]otwithstanding any otherwise applicable nonbankruptcy law," merely clarifies that "the debtor's obligation to set forth adequate means for the plan's implementation in the proposed plan may not be altered or varied by any nonbankruptcy law." CPUC Br. (Doc. # 78) at 20. This phrase then is rather innocuous, adding little to the provisions of the section. Indeed, notwithstanding its ap-

parent application to all paragraphs in subsection (a), the CPUC is not completely convinced that "[t]he 'notwithstanding' phrase \* \* \* applies to section 1123(a)(5) at all." *Id.*

PG & E contends, by contrast, that § 1123 does not merely clarify what must and may go into a plan, but substantively empowers debtors to engage in certain actions unfettered by otherwise applicable nonbankruptcy laws, including all the means by which the plan may be implemented specified in § 1123(a)(5). In short, § 1123(a)(5) preempts all nonbankruptcy laws "that are obstacles to the transactions and steps necessary to effect a reorganization plan." PG & E Br. (Doc. # 14) at 3. Under this interpretation, state laws and regulators may not stand as an impediment to the restructuring provisions of a chapter 11 plan of reorganization, although these laws will again apply to the reorganized debtor and any new entities created pursuant to the plan.

The California Hydropower Reform Coalition (CHRC) and the United States Environmental Protection Agency (EPA) have both weighed in on the subject. See Docs ## 70 and 74. The CHRC essentially mimics the CPUC's position. The EPA, although noting that PG & E has "stated that [it] intend[s] to comply with all federal regulatory laws and obtain all federal approvals necessary to implement its proposed plan," asserts that, in its view, PG & E's interpretation of the preemptive effect of § 1123(a) is too broad.

PG & E is, however, indeed correct that its interpretation of § 1123(a) is consistent with that of every court to address the issue, except, of course, the bankruptcy court below. After careful consideration, the court is convinced that the bankruptcy court's determination that § 1123(a) merely directs the debtor to place certain items

in its reorganization plan is erroneous. Rather, a review of the text and legislative history of this section demonstrates that Congress intended expressly to preempt nonbankruptcy laws that would otherwise apply to bar, among other things, transactions necessary to implement the reorganization plan.

### B

The CPUC contends that, in interpreting § 1123(a), the court should apply the so-called "presumption against preemption" and that this presumption operates in favor of the CPUC's proposed interpretation. In support of this argument, the CPUC centrally relies on *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996), in which the Supreme Court discussed the proper approach to "interpreting a statutory provision that expressly pre-empts state law." *Id.* at 484, 116 S.Ct. 2240. The Court noted that interpretation of express preemption language "does not occur in a contextual vacuum," but is rather informed by "two presumptions about the nature of pre-emption." *Id.* at 485, 116 S.Ct. 2240.

> First, because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In all pre-emption cases, and particularly in those in which Congress has "legislated * * * in a field which the States have traditionally occupied," *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), we "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Ibid*; [further citations omitted].

> \*    \*    \*    \*    \*    \*

> Second, our analysis of the scope of the statute's pre-emption is guided by our oft-repeated comment, initially made in *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963), that "the purpose of Congress is the ultimate touch-stone" in every preemption case.

*Id.* at 485–486, 116 S.Ct. 2240.

The two presumptions about the nature of preemption identified by the Court in *Medtronic* are often collapsed into one "presumption against preemption," which essentially stands for the proposition that state police powers are generally presumed not to be superseded absent indication that such preemption was the "clear and manifest purpose of Congress." See, e.g., *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 715, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985).

The application of this presumption against preemption was recently discussed by the Supreme Court in *New York v. FERC*, 535 U.S. 1, 122 S.Ct. 1012, 1023, 152 L.Ed.2d 47 (2002):

> Pre-emption of state law by federal law can raise two quite different legal questions. The Court has most often stated a "presumption against pre-emption" when a controversy concerned not the scope of the Federal Government's authority to displace state action, but rather whether a given state authority conflicts with, and thus has been displaced by, the existence of Federal Government authority. See, e.g., *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 715, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985)(citing cases); see also *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996); *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 518, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). In such a situation, the Court " 'starts with the

assumption that the historic police powers of the States were not to be superseded * * * unless that was the clear and manifest purpose of Congress.'" *Hillsborough County,* 471 U.S. at 715[, 105 S.Ct. 2371] (quoting *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)). These are not such cases, however, because the question presented does not concern the validity of a conflicting state law or regulation.

*Id.,* 122 S.Ct. at 1023.

As noted by the Court in *New York v. FERC,* the presumption against preemption is commonly applied in order to determine whether particular state laws are either expressly preempted by a federal statute or impliedly preempted by federal regulation in a given field. The question of the validity of a particular state law in light of express or implied preemption by Congress, however, is not the question posed by the instant appeal. Rather to resolve this appeal the court must choose between two radically different arguments about what sort of laws Congress meant expressly to preempt. This determination cannot be made based on a presumption, but must be made in terms of ordinary principles of statutory construction. Once this choice is made, and the "purpose of Congress," *Medtronic,* 518 U.S. at 486, 116 S.Ct. 2240, is clarified, then the presumption against preemption may become relevant—although this is somewhat doubtful given the seemingly broad reach of the "notwithstanding" phrase—in order to determine whether a particular state law is preempted. But to apply the presumption against preemption to determine Congress' intent would be to place the cart before the horse.

Rather than beginning with a presumption, therefore, as an initial matter at least, the court must look to the plain language of the statute. See, e.g., *Exxon Corp. v. Hunt,* 475 U.S. 355, 106 S.Ct. 1103, 89 L.Ed.2d 364 (1986).

## C

As noted, every court except the bankruptcy court below to have considered § 1123(a)(5) has concluded that this section contains an express preemption of nonbankruptcy laws that would otherwise apply to the restructuring transactions provided for in a reorganization plan. The case law on this subject is, however, rather limited. By far, the court to have considered this matter in the most depth is the United States Bankruptcy Court for the District of New Hampshire in *Public Service Company of New Hampshire v New Hampshire (In re Public Serv. Co),* 108 B.R. 854 (D.N.H.1989). After conducting a quite helpful and thorough analysis of the (again rather limited) legislative history of § 1123(a), the New Hampshire bankruptcy court concluded that the meaning of § 1123(a)(5) is clear:

> With regard to the present statutory provision before the court, i e § 1123(a)(5) providing that "notwithstanding any otherwise applicable nonbankruptcy law" a plan of reorganization "shall" contain adequate provisions for the plan's implementation, in terms of the necessary restructuring of the debtor and its assets and liabilities common to all plans of reorganization in complex cases, the statute would seem to be plain on its face to indicate an express preemptive intent as to such restructuring provisions of a chapter 11 plan of reorganization.

*Id.* at 882.

Indeed, to the New Hampshire bankruptcy court, the conclusion "seems obvious" that § 1123(a)(5):

> on its face contemplates that restructuring transactions necessary to a plan of

reorganization may be provided notwithstanding nonbankruptcy law, and that upon confirmation of the plan pursuant to § 1129(a) of the Bankruptcy Code the confirmed plan—and the reorganized debtor *created* thereby—will be governed by those provisions.

*Id.*

Besides its thorough consideration of the precise question posed in the instant appeal, *In re Public Serv. Co.* is particularly interesting because it is quite factually similar to the situation here. That case too involved an electric utility debtor in reorganization, seeking to create new limited liability companies, some of which would no longer be under state regulatory control after reorganization, but would be under the jurisdiction of FERC. Similarly, the state commission in that case argued that its approval of the restructuring transactions was required by state law and the utility resisted submitting to this approval.

The New Hampshire bankruptcy court noted that its interpretation of the preemptive force of § 1123(a)(5) was also reached by the Fourth Circuit in *Universal Cooperatives, Inc. v. FCX, Inc.*, 853 F.2d 1149 (4th Cir.1988). In *FCX,* appellee Universal challenged an order of the bankruptcy court, affirmed by the district court on appeal, which, pursuant to § 1123(a)(5)(D), authorized FCX to release collateral securing its indebtedness to Universal in satisfaction of Universal's claim, in a manner that violated Universal's bylaws. Section 1123(a)(5)(D) provides that, "(a) notwithstanding any otherwise applicable nonbankruptcy law, a plan shall— * * * (5) provide adequate means for the plan's implementation, such as—* * * (D) sale of all or any part of the property of the estate either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those

having an interest in such property of the estate." Universal, to which FCX was in debt, had previously issued to FCX "patronage certificates" which were redeemable by Universal at the discretion of Universal's board of directors. FCX desired to offset Universal's claim by the release of the patronage certificates and contended that § 1123(a)(5)(D) preempted any restrictions in Universal's bylaws applying to such a release. The Fourth Circuit reasoned:

> Because "Congress may * * * abrogate state law entitlements in bankruptcy pursuant to its Bankruptcy Clause Power, U.S. Const., art. I, § 8, cl. 4," *In re Farmers Markets,* 792 F.2d 1400, 1403 (9th Cir.1986), we must ask further whether there exists any conflicting bankruptcy law which overrides the discretionary power over the redemption of the patronage certificates vested in Universal's board by state law and its bylaws. FCX here contends that § 1123(a)(5)(D) preempts the restrictive provisions of Universal's by-laws and allows it to release the patronage certificates in satisfaction of Universal's claim.
>
> * * * * * * *
>
> In 1984, the opening clause of § 1123(a) was amended to read: "Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall * * *." By its plain language then, § 1123(a)(5)(D) overrides nonbankruptcy law restrictions on the distribution of collateral to satisfy a claim secured by the same. Accordingly, § 1123(a)(5)(D) supersedes the discretionary power over surrender of the patronage certificates bestowed on Universal's board by its by-laws.

*Id.* at 1154.

In the Ninth Circuit, too, the only case to address the issue reached a similar conclusion of the preemptive effect of § 1123(a)(5). In *In re Entz–White Lum-*

*ber & Supply, Inc.,* 850 F.2d 1338 (9th Cir.1988), the Ninth Circuit considered § 1123(a)(5)(G), which as an example of "adequate means for the plans implementation," specifies the "curing or waiving of any default." Great Western Bank & Trust (Great Western), an Arizona banking corporation, objected to confirmation of a reorganization plan that provided for the cure of debtor's default on a loan by Great Western by the payment of the full principal balance owed as well as interest accrued, at a rate of 1.5%. Great Western asserted that pursuant to the terms of the loan agreement it was entitled to interest at the rate of 18% per annum in the event of default. Debtor (Entz–White) argued that its payment of the debt and interest under the plan amounted to a "cure" of the default and that, pursuant to § 1123(a)(5)(G), this cure "nullified any consequences of the default, including a post-maturity higher interest rate." *Id.* at 1340.

The bankruptcy court, the district court and the Ninth Circuit all ruled in favor of the debtor, accepting this argument. The Ninth Circuit held:

> [B]y curing the default, Entz–White is entitled to avoid all consequences of the default—including higher post-default rates. * * * It is clear that the power to cure under the Bankruptcy Code authorizes a plan to nullify all consequences of default, including avoidance of default penalties such as higher interest.

*Id.* at 1342.

As it is binding precedent, *Entz–White* would seem to be the beginning and the end of the matter. The court of appeals begins its opinion by stating that debtor's argument was made under § 1123(a)(5)(G). Noting that this argument indeed "seems to conform to the broad language of section 1123," the court of appeals discusses

§ 1124(2), which determines whether a party is impaired by a chapter 11 reorganization plan. Because of this discussion, the CPUC contends that PG & E's reliance upon *Entz–White* is "way off the mark." But the CPUC's attempt to distinguish the case in this manner is "off the mark." The court of appeals considered § 1124(2) at length, but only in response to Great Western's argument that Congress intended in the bankruptcy code "to allow debtors to cure only those defaults the consequences of which are solely acceleration of the remaining payments due." *Entz–White,* 850 F.2d at 1340. The Ninth Circuit rejected this argument by analyzing § 1124(2). More importantly, the Ninth Circuit was not swayed from its belief that Entz–White's argument that a cure provided for in the reorganization plan nullified any consequences of default "conform[ed] to the language of section 1123." *Id.* Indeed, in this light, the most plausible explanation for the Ninth Circuit's lack of an extended discussion of the preemptive effect of § 1123 is that it—as did the New Hampshire bankruptcy court and the Fourth Circuit—viewed the preemptive effect of this section as evident and not requiring prolonged discussion.

The court is aware of at least one other court holding explicitly that it is "clear" that § 1123(a) affirmatively empowers actions otherwise barred by nonbankruptcy law. See *In re Buttonwood Partners, Ltd.,* 111 B.R. 57, 59–60 (noting that "§ 1123 clearly contemplates that a plan may impair a class of claims 'notwithstanding any other applicable nonbankruptcy law;' an event occurring here."). See also *In re Public Serv. Co.,* 108 B.R. at 883 n. 25 (listing other cases addressing § 1123(a)(5)).

In contrast, the court is not aware of a single case, other than the decision challenged herein, holding that § 1123(a) is

merely a "directive" statute, preempting only nonbankruptcy laws that might direct what should go in a reorganization plan. The CPUC urges the court to follow the decision of the Ninth Circuit in *Baker & Drake v Public Serv Comm'n (In re Baker & Drake)*, 35 F.3d 1348 (9th Cir.1994), and, indeed, this is the case given the most attention by the bankruptcy court in the challenged order. Yet *Baker & Drake* is simply not on point.

Baker & Drake (Baker), a taxicab operator employing approximately 200 drivers, filed for chapter 11 bankruptcy. As part of its reorganization plan, Baker proposed converting its employee-drivers into independent contractors, who would lease the cabs from Baker. As noted by the Ninth Circuit, "[t]his arrangement would shift the ultimate control over taxi services from Baker to the drivers themselves. Apart from the effect it had on Baker's tort liability and insurance premiums, Baker stood to save a good deal of money because it would no longer be liable for payroll taxes." *Id.* at 1350.

The problem, however, was that Nevada law prohibited certified "common motor carriers," such as Baker, from leasing a taxicab to another person and required " 'every driver of a taxicab [to] be either the holder of a certificate or the employee of a holder of a certificate.' " *Id.*, quoting Nev. Admin. Code (NAC) § 706.371. Notwithstanding this prohibition, the bankruptcy court "not only approved the proposed reorganization plan, but also enjoined the Nevada Public Service Commission (PSC) from enforcing NAC 706.371 against Baker," based on its determination that Nevada's regulation of the taxi business conflicted with the Bankruptcy Act's goal of fostering reorganizations. *Id.* Upon appeal, the district court overturned this decision, holding that the bankruptcy code did not preempt NAC 706.731 and vacated the bankruptcy court's injunction.

The Ninth Circuit, in turn, quite sensibly affirmed this decision, rejecting Baker's claim that "the Bankruptcy Act *impliedly preempts* Nevada's regulation of taxi services," *id.* at 1353 (emphasis added), because, among other things, NAC 706.371 is "not just an economic regulation, but one reasonably intended to secure the public convenience and safety" and, "[m]ore importantly," because NAC 706.371 "does not directly conflict with the purposes of the Bankruptcy Act in any way which could be generalized beyond the facts of the present case." *Id.* at 1354–55.

*Baker & Drake* is not an express preemption case. Baker did not argue that NAC 706.371 was expressly preempted by § 1123(a)(5), or any other statutory provision, nor would it have made sense to do so. Baker was seeking to preempt ongoing state law, applying not to the transactions necessary for reorganization, but to business activities engaged in by the reorganized debtor after the reorganization. Accordingly, *Baker & Drake* is simply not relevant to the instant appeal.

But the bankruptcy court's heavy reliance upon *Baker & Drake*, see Bankr. Dec. at 12–17, does suggest why that court may have been led astray. The bankruptcy court's decision seems to have been guided by two primary concerns: the scarcity of legislative history on the relevant statutory provisions and the concern that construing § 1123(a)(5) to grant the right "to disaggregate with unfettered preemption of any contrary nonbankruptcy law," *id.* at 40, would lead to "absurd results." *Id.* at 19. The court will discuss the legislative history of § 1123 below. But it is the bankruptcy court's list of the supposedly absurd results of PG & E's urged interpretation, which PG & E refers to as the bankruptcy court's "parade of horribles,"

that demonstrate how the bankruptcy court was misled. For each of these absurdities contemplates *ongoing illegality,* such as that at issue in *Baker & Drake,* and not conduct or action that is contemplated by PG & E in its restructuring plan. The bankruptcy court was concerned, for example, that under PG & E's interpretation a reorganization plan could approve the sale of alcohol to minors, the dumping of toxic waste or the formation of a monopoly. See Bankr Dec at 19. But such actions involve contemplated ongoing illegality. In contrast, PG & E seeks the suspension of nonbankruptcy law applying only to transactions necessary for reorganization and does not contend that the reorganized companies would be exempt from any laws on a going forward basis by virtue of reorganization. The graphic but undifferentiated nature of the illegalities that the CPUC contends, and the bankruptcy court accepted, would follow from holding that § 1123(a) preempts nonbankruptcy obstacles to PG & E's reorganization highlights the tenuousness of CPUC's position on this appeal.

■ The argument that absurd and/or undesirable consequences flow from a particular statutory construction is of little direct relevance to statutory construction. See, e g, *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995)(in considering preemption claims, courts "begin as * * * in any exercise of statutory construction with the text of the provision in question, and move on, as need be, to the structure and purpose of the Act in which it occurs."). Nor must the court consider absurd consequences of a statutory construction, potentially embraced by the literal language of an act, when the matters at issue do "not test the margins of the Act" but "fall within the heartland * * *."

*National Cable & Telecomms. Ass'n Inc. v. Gulf Power Co.,* 534 U.S. 327, 122 S.Ct. 782, 790, 151 L.Ed.2d 794 (2002). Putting the direct relevance of the "parade of horribles" to the court's task of statutory interpretation aside, however, the court is unconvinced that PG & E's interpretation of § 1123(a)(5) leads to absurd or undesirable results.

As noted, the preemption of laws otherwise applicable to restructuring transactions would not authorize ongoing illegality by the reorganized debtor and any new entities created through reorganization. Accordingly, in the unlikely event that a debtor in bankruptcy would propose such things as the sale of alcohol to minors or discharge of toxic wastes into waterways, this conduct would be reachable by the same state and federal laws designed to prohibit such conduct.

Moreover, the bankruptcy code contains several provisions making it highly unlikely that reorganization plans contemplating ongoing illegality would be seriously considered by the bankruptcy court, much less confirmed in a plan of reorganization. Section 1123(a)(5) itself requires that reorganization plans contain "adequate" means of implementation. Section 1129(a)(3) permits confirmation of a reorganization plan by the bankruptcy judge only if, among other things, it is proposed in "good faith," § 1129(a)(3), and "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the plan." § 1129(a)(11). The good faith test of § 1129(a)(3) has been interpreted to mean that "the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected.'" *Koelbl v. Glessing (In re Koelbl),* 751 F.2d 137, 139 (2d Cir.1984), quoting *Manati Sugar Co. v. Mock,* 75 F.2d 284, 285 (2d Cir.1935). See also *Con-*

*nell v. Coastal Cable TV, Inc.*, 709 F.2d 762, 765 (1st Cir.1983)(to satisfy good faith requirement, reorganization plan "must bear some relation to the statutory objective of resuscitating a financially troubled corporation."). The Ninth Circuit has interpreted § 1129(a)(11) to "prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *Pizza of Hawaii, Inc. v. Shakey's Inc. (In re Pizza of Hawaii)*, 761 F.2d 1374, 1382 (9th Cir.1985), quoting 5 Collier on Bankruptcy, 15th ed., ¶ 1129.02 at 1129–34 (1984). A plan contemplating ongoing illegality, of course, is quite likely to promise more than it can attain. These provisions, among others, therefore, provide ample grounds for the exercise of the bankruptcy court's discretion to refuse to confirm plans contemplating ongoing illegality.

The CPUC also asserts that PG & E's interpretation of § 1123(a)(5) could, irrespective of illegality *after* reorganization, shield debtors from laws designed to prohibit undesirable conduct otherwise applying to the restructuring transactions themselves. The CPUC argues, for example, that the preemption of laws otherwise applicable to transactions necessary to carry out a reorganization plan could permit anticompetitive mergers through reorganization, which would otherwise violate § 7 of the Clayton Act, 15 USC § 18, or analogous state laws, but which would not necessarily result in the formation of a monopoly, prohibited by § 2 of the Sherman Act, 15 U.S.C. § 2. The CPUC and the EPA further argue that PG & E's proposed statutory construction would permit debtors to evade such things as certain laws requiring environmental review by regulators.

The requirements of § 1129(a)(3), of course, would apply here as well, prohibiting confirmation of reorganization plans not proposed in good faith. More importantly, however, the court thinks that the CPUC's worst-case scenarios are rather more equivocal than characterized by the CPUC. Consider, for example, a corporate debtor that could reorganize in order to satisfy creditors and emerge solvent by, among other things, merging with another corporation. If such a merger would result in a monopoly then a reorganization plan proposing it would be unlikely to be confirmed. It is by no means clear, however, that a merger that would perhaps have some anticompetitive impact reachable by § 7 of the Clayton Act or some analogous state law, but which would *not* result in a monopoly—and which would, moreover, rescue a debtor from bankruptcy—would be undesirable.

Nor is the court convinced that the temporary suspension of environmental review requirements that would otherwise apply to (often somewhat fictional) restructuring transactions is undesirable. In the instant case, for example, a CEQA review, according to the CPUC, is triggered by transactions incidental to PG & E's disaggregation. Permitting such review would permit state regulators to exercise a veto over the restructuring of a utility in bankruptcy, which could potentially impose a dramatic limitation on PG & E's ability to reorganize despite the fact that no change whatever were made to any PG & E operation. It is difficult for the court to discern the countervailing consideration mandating the ability of state regulators to exercise such power, when PG & E itself has, presumably, already gone through CEQA review and the four entities emerging from bankruptcy will be required to comply with all applicable state and federal laws on an ongoing basis.

Indeed, as counsel for PG & E noted at oral argument, given the strong federal interest in the rehabilitation of corporate debtors, it would seem to be the CPUC's interpretation that may well lead to absurd consequences. If § 1123(a)(5) does not permit express preemption, then the only tool for preempting laws that would otherwise bar reorganization is implied preemption, which is a rather blunt tool for such an important task.

### D

The bankruptcy court also determined that the legislative history of § 1123 did not support PG & E's interpretation, stressing two features of the legislative history that it asserted supported the interpretation that § 1123 is merely a descriptive statute. First, the bankruptcy court concluded that § 1123(a) was a "carryover from its counterparts under the former Bankruptcy Act," which did not contain a preemption provision, but merely described provisions a bankruptcy petitioner may and must include in a reorganization plan. See Bankr. Dec. at 21. Second, the bankruptcy court found it significant that the legislative history accompanying the 1980 amendment to § 1123(a), which added the phrase "[n]otwithstanding any otherwise applicable nonbankruptcy law" did not discuss preemption, but instead stated that: "This amendment makes it clear that the rules governing what is contained in the reorganization plan are those specified in this section; deletes a redundant word; and makes several stylistic changes." See *id.* at 25, quoting H.R. Rep. 96–1195, at 22, 122–23, 96th Cong., 2d Sess. 1980 (July 25, 1980). "If the words 'notwithstanding otherwise applicable nonbankruptcy law' meant that a debtor could propose a plan contrary to any law," concluded the bankruptcy court, "Congress would not have treated the amendment as merely 'stylistic.'" *Id.* at 25.

The language cited by the bankruptcy court accompanied the first bill proposing the addition of the "notwithstanding" phrase. This bill and a subsequent bill, also including the proposed addition, failed. "The bill that finally became law arose from a Senate bill that referred to this change as a 'technical stylistic change [ ].'" S. Rep. No. 65, 98th Cong., 1st Sess. 84 (1983). There are no committee reports with regard to the 1984 amendments, but the change to § 1123(a)(5) was included verbatim from the prior bills under a subtitle captioned "Miscellaneous Amendments." The 1984 Amendments came out of a conference committee with no report other than the agreed-upon bill itself. On the floor the changes including the change to § 1123(a)(5) were referred to as the "technical amendments" subtitle. 130 Cong. Rec. S8887, S8888 (June 29, 1984). *In re Public Serv. Co.,* 108 B.R. at 865. See App. Leg. History (Doc. # 73) at LH 001, 017, 041.

As discussed at length in *In re Public Serv. Co.,* 108 B.R. at 863–866, however, the most relevant change to the bankruptcy code for present purposes did not occur in 1984, with the addition of the "notwithstanding" phrase, but in 1978 with the adoption of the Bankruptcy Reform Act of 1978. Before that act, public utilities were required to obtain the approval of the utilities' governing commission before plans of reorganization could be approved. The 1978 Reform Act deleted this statutory requirement. A little history is helpful to understand the import of this.

Before 1934, corporate reorganization was primarily accomplished through equity receiverships in the federal courts. See 6 Collier on Bankruptcy, 14th Ed., ¶ 0.04 (1978). In 1933 and 1934, § 77, governing interstate railroad corporations, and § 77B, governing ordinary corporate debt-

ors, were added by amendments to the Bankruptcy Act of 1898. See *id.* Section 77B(e)(2) addressed debtor utilities:

> In case the debtor is a utility subject to the jurisdiction of a regulatory commission or commissions or other regulatory authority or authorities, created by the laws of the State or States in which the properties of the debtor are operated, a plan of reorganization shall not be confirmed until (a) it shall be submitted to each such commission or authority having regulatory jurisdiction over the debtor, (b) an opportunity shall be afforded each such commission or authority to suggest amendments or objections to the plan, and (c) the judge shall consider such amendments or objections at a hearing at which each such commission or authority may be heard. In case the debtor is a public utility corporation wholly interstate in character no court shall approve any plan or reorganization if the regulatory commission of such State having jurisdiction over such public utility certifies that the public interest is affected by said plan, unless said regulatory commission shall first approve of said plan as to the public interest therein and the fairness thereof. If said regulatory commission shall not within thirty days or such additional period as the court may prescribe after the submission of a plan to it file said certificate it shall be deemed that the public interest is not affected by said plan.

Reprinted in 6 Collier on Bankruptcy, 14th Ed., ¶ 0.06 (1978).

Section 77B(f) further provided for state approvals before plan confirmation. The requirement of state approval for public utility plans of reorganization survived the extensive amendments to the Bankruptcy Act by the Chandler Act of 1938. Section 177, in chapter X of the amended act, provided, for example:

> In case a debtor is a public-utility corporation, subject to the jurisdiction of a commission having regulatory jurisdiction over the debtor, a plan shall not be approved * * * until—
>
> (1) it shall have been submitted to each such commission;
>
> (2) an opportunity shall have been afforded each such commission to suggest amendments or offer objections to the plan; and
>
> (3) the judge shall have considered such amendments or objections at a hearing at which such commission may be heard.

Reprinted in Collier on Bankruptcy, 15th Ed., App. Pt. 3(a), (2002). See also § 178 (requiring certification of approval of utility plan by state commission); § 224 (requiring, "in the case of a public-utility commission, the procuring of authorization, approval, or consent of each commission having regulatory jurisdiction over the debtor" for the taking of "all action necessary to carry out the plan.").

In other words, the bankruptcy code at one time explicitly provided precisely what the CPUC urges is presently required to effect PG & E's plan of reorganization. But the provisions requiring approval by public utility commissions for the transactions necessary to carry out a utility's reorganization plan were not made part of the 1978 Reform Act, which, considering the inclusion of such provisions in the bankruptcy code from its origin, is a omission that can be inferred to have some consequence. As the *In re Public Serv. Co.* court noted: "After 44 years of requiring state approval for public utility reorganizations, the statutory law substantially changed with the adoption of the 1978 Code * * *. There is only one reference in chapter 11 of the Bankruptcy Code to any utility regulatory agency approvals and that is for rates." 108 B.R. at 864,

citing § 1129(a)(6)(discussed below). Moreover, as PG & E points out, the 1978 Reform Act largely carried forward the regulatory approval requirements for railroads. See §§ 1166 and 1172(b)("If * * * transfer of, or operation of or over, any of the debtor's rail lines by an entity other than the debtor or a successor to the debtor under the plan would require approval by the Commission under a law of the United States, then a plan may not propose such a transfer or such operation unless the proponent of the plan initiates an appropriate application for such a transfer or such operation with the Commission and * * * the Commission * * * approves such application * * *.").

The reason for the removal of state regulatory approval for utility reorganization in the bankruptcy code does not appear to have been discussed in the legislative history accompanying the 1978 Reform Act. It is worth noting, however, that Congress established FERC as an independent agency within the Department of Energy in 1977, see 42 U.S.C. § 7171, shortly before enactment of the 1978 Reform Act, and granted that agency an expanded role in the dual sphere of regulation over the provision of energy, codified in the Federal Power Act, 16 U.S.C. §§ 824–824m. That the withdrawal of the ability of state regulators to veto reorganization of public utilities in federal bankruptcy proceedings followed closely behind an expanded federal role in the regulation of energy is likely not coincidence.

Nevertheless, notwithstanding a lack of legislative history explicitly discussing Congress' reasoning, the removal of the requirement of approval by state commissions is quite significant. See *Muscogee Nation v. Hodel*, 851 F.2d 1439, 1444 (D.C.Cir.1988)("where the words of a later statute differ from those of the previous one on the same or related subject, the

Congress must have intended them to have a different meaning.").

Only one paragraph of the committee reports accompanying the 1978 Code is devoted to § 1123(a)(5), appearing in both the House and Senate reports, which reads:

> Paragraph 4 [which later became paragraph (5)] of subsection (a) is derived from section 216 of chapter X with some modifications. It requires the plan to provide adequate means for the plans execution. These means may include retention by the debtor of all or any part of the property of the estate, transfer of all or any part of the property of the estate to one or more entities, whether organized pre- or post-confirmation, merger or consolidation of the debtor with one or more persons, sale and distribution of all or any part of the property of the estate, satisfaction or modification of any lien, cancellation or modification of any indenture or similar instrument, curing or waiving of any default, extension of maturity dates or change in interest rates of securities, amendment of the debtor's charter, and issuance of securities.

H.R. Rep. No. 595, 95th Cong., 1st Sess. 407, (1977), U.S.Code Cong. & Admin.News 1978, 5963, 6363; S. Rep. No. 989, 95th Cong, 2d Sess. 119 (1977), U.S.Code Cong. & Admin.News 1978, 5787, 5905.

This language, if largely by the absence of any reference to the contingency of the specified possibilities on compliance with nonbankruptcy law or regulatory approval, seems to indicate that such actions may be *taken*—and not just put in a plan—notwithstanding any nonbankruptcy law. Significantly, this implication seems to have been made explicit in a statement on the floor of the Senate, by Senator DeConcini, chairman of the Subcommittee on Im-

provements in Judicial Machinery of the Senate Committee on the Judiciary, "in order to explain the House amendment to the Senate amendment to H.R. 8200." 124 Cong. Rec. 33992 (Oct. 5, 1978). Section 1123, DeConcini noted, "represents a compromise between similar provisions in the House bill and Senate amendment."

> Section 1123(a)(5) of the House amendment is derived from a similar provision in the House bill and Senate amendment but deletes the language pertaining to "fair upset price" as an unnecessary restriction. Section 1123 is also intended to indicate that a plan may provide for any action specified in section 1123 in the case of a corporation without a resolution of the board of directors. If the plan is confirmed, then any action proposed in the plan may be taken *notwithstanding any otherwise applicable law* in accordance with section 1142(a) of title 11.

*Id.* at 34005, emphasis added.

DeConcini's reference to § 1142(a), which imposes a duty on the debtor to carry out the plan "[n]otwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation relating to financial condition * * *," in a discussion of § 1123, would seem on first glance to make his remarks somewhat ambiguous. Section 1142 provides that a reorganized debtor and any newly created entity are obligated to carry out the plan "[n]otwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation relating to financial condition." Section 1123(a)(5) governs the obligation of a plan to provide adequate means for reorganization "[n]otwithstanding any otherwise applicable nonbankruptcy law." Read together, these sections direct that the reorganization transactions themselves may be accomplished without hinderance from nonbankruptcy law, but that going forward from bankruptcy, the reorganized debtor and any new entities must comply with all laws in carrying out the reorganization, except those relating to financial condition.

Significantly, the very language used by DeConcini, with the insertion of the word "nonbankruptcy," in explaining the House and Senate compromise embodied in the 1978 Reform Act found its way into the act by the 1984 amendment. This may explain why the addition of the "notwithstanding" phrase was characterized as technical and stylistic; the addition of this phrase merely clarified and reaffirmed the preemptive scope of § 1123(a), intended by Congress by the enactment of the 1978 Reform Act.

The legislative history, therefore, supports PG & E's interpretation of § 1123(a)(5). But this attention to legislative history, in turn, merely supports the plain language of this section, to which, with this background, the court will now return.

■ The term "notwithstanding" is well recognized as a term used to express broad preemptive intent. Indeed, as noted by the Supreme Court, courts have long held that a clearer statement of an intent "to supersede all other laws" is " 'difficult to imagine.' " *Cisneros v. Alpine Ridge Group,* 508 U.S. 10, 18, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993), quoting *Liberty Maritime Corp. v. United States,* 928 F.2d 413, 416 (D.C.Cir.1991) and citing, among other authority, *In re FCX,* 853 F.2d at 1154. Moreover, the phrase "notwithstanding any otherwise applicable nonbankruptcy law" clearly expresses an intent affirmatively to authorize actions that are otherwise prohibited by nonbankruptcy law, which accords with PG & E's interpretation of the section. The interpretation of the CPUC and the bankruptcy court, however, would not have § 1123(a) authorize otherwise prohibited actions, but would

rather have the "notwithstanding" phrase serve a much more limited role, merely clarifying that § 1123(a) is *the* section that designates what must go into a reorganization plan.

As PG & E correctly notes, the CPUC and the bankruptcy court have trouble coming up with any otherwise applicable nonbankruptcy laws that this phrase would override. The bankruptcy court "imagined" that the statute could preempt a state law that "would prohibit a party from even submitting a plan to the bankruptcy court without first obtaining approval from a debtor's shareholders." Bankr. Dec. at 18, citing remarks by De-Concini. But § 1123(a) does not concern the procedure for submission of a plan to the bankruptcy court; it concerns what must be provided for in a plan. The same defect is present in the bankruptcy court's example of "labor laws that might obligate a plan proponent to negotiate in good faith before submitting a plan." *Id.* The CPUC's examples are no more apt.

The CPUC mentions state statutes "that provide for a dissolving corporation to file a plan of distribution containing specified mandatory elements" and suggests that § 1123(a) merely provides that those statutes "do not govern, and that section 1123(a) alone says what must be in the plan." CPUC Br. (Doc. # 78) at 35. Two interpretations are possible under this account. Either the CPUC would have Congress mean that any other statute that specifies what must go in a reorganization plan is invalid, or the CPUC would have Congress mean that § 1123(a) is an independent supplement to other laws specifying what must go in a reorganization plan. In *neither* case would Congress have referred to "otherwise applicable" laws. The reference to "otherwise applicable" laws would appear to reflect Congress' intent temporarily to suspend the operation of

laws of general applicability, which is not the meaning of the phrase given by the CPUC's interpretation.

The court also thinks it significant that § 1123(a)(5) requires the provision of "*adequate* means for the plan's implementation" in the plan. If state regulatory approval were required for all the transactions necessary to effect reorganization, how would the debtor, the court or, in the words of the bankruptcy court, "a hypothetical investor typical of holders of claims or interests of a relevant class," know whether the plan provisions were adequate or otherwise "make an informed judgment" about the plan? Bankr. Dec. at 22. At best, a utility could guess whether what was provided for in a plan would be adequate for reorganization based on an estimate of the chances of regulatory approval. "[S]ince the language of Section 1123 is obviously intended to provide for plans that could go forward for confirmation subject only to the requirements of section 1129—including the rate approval power of a state regulatory agency—it would be nonsensical to interpret Section 1123 to simply list what a plan may include but with the result that such a plan could not be confirmed." *In re Public Serv. Co.*, 108 B.R. at 884.

Moreover, other elements of the bankruptcy code support the conclusion that Congress intended to preempt nonbankruptcy laws otherwise applicable to transactions necessary for reorganization. In particular, § 1129(a), which specifies the conditions precedent for approval of the plan by the bankruptcy court, provides that:

(a) The court shall confirm a plan only if all of the following requirements are met:

\*   \*   \*   \*   \*   \*

(6) Any governmental regulatory commission with jurisdiction, after

confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

Congress, in other words, expressly provided that a plan contemplating a rate change by a utility under the jurisdiction of a regulatory commission cannot be confirmed unless the rate change is approved by the appropriate regulatory commission. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 432, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). See also *United States v. Jones,* 567 F.2d 965, 967 (10th Cir.1977)(noting that "if a statute specifies one exception to the general application, other exceptions are excluded * * *."). The clear implication of § 1129(a)(6) is that state regulatory approval is not required for plan provisions unrelated to rate changes.

The addition of § 1123(d), added by Congress in 1994, which carves out an express limitation to the preemptive effect of § 1123(a), further supports the interpretation that § 1123(a) preempts laws that may obstruct transactions contemplated by a reorganization plan. See Bankruptcy Reform Act of 1994, Pub. L. No. 103–394, § 305(a), 108 Stat. 4106, 4134. Section 1123(d) provides:

> Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

Although the addition of this section arguably calls the specific holding of *Entz–White* into question, see *Southland Corp. v. Toronto–Dominion,* 160 F.3d 1054, 1059 n. 6 (5th Cir.1998), it would indeed seem to confirm a reading of § 1123(a) as expressly preempting laws otherwise applying to plan provisions. On its face, § 1123(d) appears to carve out an exception from the broad preemptive effect of § 1123(a)(5)(G), which governs the curing or waiving of any default in a debtor's plan, by requiring that the amount necessary to cure a default *shall* be determined by the underlying agreement and applicable nonbankruptcy law. If § 1123(a) did not (otherwise) broadly preempt otherwise applicable laws governing, among other things, the curing of any default, the reference in § 1123(d) to "subsection (a)" would make little sense. PG & E's query aptly exposes the strained interpretation given to § 1123(d) by the CPUC: "[W]hy would Congress have bothered to prohibit a proponent from *merely proposing* that a plan accomplish something that the Code bars a plan from actually accomplishing?" PG & E Supp. Br. at 3, emphasis in original.

■ Finally, the court notes that PG & E's interpretation comports more closely with the purposes of chapter 11 of the bankruptcy code. "The paramount policy and goal of Chapter 11, to which all other bankruptcy policies are subordinated, is the rehabilitation of the debtor." *In re Ionosphere Clubs, Inc.,* 98 B.R. 174, 176 (Bankr.S.D.N.Y.1989). "The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 528, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), citing H.R. Rep. No. 95–595, p. 220 (1977), U.S.Code Cong. & Admin.News 1978, 5963, 6179–80.

As in *In re Public Serv. Co.*, "the issue is a narrower one than may first appear." 108 B.R. at 861. PG & E contends that the bankruptcy code expressly prohibits the exercise of a veto power by state regulators over the transactions necessary to reorganize. PG & E's concern that its contemplated reorganization would be thwarted by state regulators is hardly an idle one; the CPUC's discussion of the inadequacies of federal regulation evince an entrenched resistance to relinquishing regulatory jurisdiction over PG & E's operations. See CPUC Br (Doc. # 78) at 13. But the ability of debtors to reorganize and thereby avoid liquidation under chapter 11 would be severely compromised if state regulators could thwart otherwise adequate means of reorganization. As the New Hampshire bankruptcy court observed: "Corporate reorganization cannot work without substantial restructuring of the corporate entity that is relatively prompt and free from litigation costs and delays and fragmented proceedings in numerous other forums apart from the reorganization court." 108 B.R. at 890.

The preemption issues raised by reorganization are particularly acute in the case of a public utility in bankruptcy, as perhaps no other debtor is subject to as much state regulation as the public utility. But the removal of the statutory right of approval by state commissions of the restructuring of public utilities by the 1978 Bankruptcy Reform Act is powerful evidence that Congress concluded that public utilities should no longer be subject to the costs, delays and uncertainty accompanying such a requirement. The bankruptcy code at one time permitted state regulatory commissions to wield considerable power over the reorganization of public utilities. But now—with the exception of the right to approve rate changes—it does not. Nonbankruptcy laws otherwise applicable to the "restructuring transactions neces-sary to an effective and feasible reorganization" are expressly preempted by the bankruptcy code. *In re Public Serv. Co.*, 108 B.R. at 891.

### III

Accordingly, the bankruptcy court's March 18, 2002, order disapproving disclosure statement must be REVERSED and the matter remanded for proceedings consistent with this order.

IT IS SO ORDERED.